404 So.2d 956 (1981)
STATE of Louisiana
v.
John Reed CAMPBELL.
No. 81-K-1212.
Supreme Court of Louisiana.
September 28, 1981.
*957 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Bridget Bane, Louise Korns, Asst. Dist. Attys., for plaintiff-relator.
Julian R. Murray, Jr., New Orleans, for defendant-respondent.
SWIFT, Justice Ad Hoc.[*]
John Reed Campbell was charged with conspiracy to commit aggravated crime against nature between September 24, 1974, and September 10, 1976. La.R.S. 14:26 and 89.1. The trial court sustained the defendant's motion to quash the bill of information on the basis of prescription, i. e., failure to commence his trial without two years from when he was joined in the bill. La.Cr. C.P. Art. 578. The state has assigned this ruling as error and the case is now before this court on a writ of certiorari.
On September 10, 1976, the defendant's residence at 7936 West Laverne Street in New Orleans was searched by the city police pursuant to a search warrant. They seized pictures, slides, magazines, books and letters apparently pertaining to sex acts between young boys and adult males. The defendant was not arrested at this time although he was at home during the search. He left New Orleans two days later and except for two brief visits did not return to Louisiana for over three and one-half years. Wanted reports were filed by the New Orleans Police Department on September 14, 1976, and September 21, 1976. On September 24, 1976, Campbell's name was placed in the department's computer along with his wanted status. A warrant for his arrest was issued on November 8, 1976. Defendant was formally charged in a bill of information on July 13, 1977, but was not located until April 23, 1980, when he was arrested in Yuma, Arizona.
The state contends that prescription was interrupted under La.C.Cr.P. Art. 579(1).[1]
On the contrary, the defendant maintains that he had no knowledge there were charges against him or that he was wanted therefor until shortly before his arrest in 1980. Further, he contends that his absence from this state was for business purposes, not to avoid detection, apprehension or prosecution so as to interrupt the two year prescription.
At the motion hearing the defendant testified he went to the district attorney's office after his home was searched and was told that he was not wanted for anything by the police. Thereafter, he left the city to fulfill two out-of-town commitments that *958 he had made months in advance. He said he spent the rest of his absence painting in various states to enhance his national reputation as an artist. The defendant denied receiving any information during his absence indicating that he was wanted by the authorities for a criminal charge until two or three days before his arrest. However, he admitted his tenants told him in telephone conversations that the police wished to question him, but defendant said he thought this concerned charges against other persons.
The defendant's testimony in this respect was corroborated by Glen Morgan, one of the two attorneys he had consulted at this time about this matter.[2] However, Mr. Morgan acknowledged that he was told by Campbell that his first lawyer had informed him he was wanted by the police.
Detective Mason Spong, one of the officers assigned to investigate what was referred to as the "Boy Scout Cases" wherein several adults were charged with crimes against nature involving some young scouts, testified that from September, 1976 to April, 1980, he and other detectives attempted to locate the defendant. They contacted Campbell's tenants, friends and his attorney and left word that he was wanted by the police. However, these efforts were fruitless.
Mrs. June Weisheit, a tenant of Campbell's, testified that the defendant had been away on business before, but usually for only a couple of weeks at a time. She also stated that she had telephone conversations with Campbell during his lengthy absence and she informed him in these calls that he was wanted by the police.
When asked about this at the hearing the defendant testified:
Q. How about your tenants? Did either one of them ever give you any indication that the police wanted you for the purposes of talking with you?
A. That's the impression I got.
Campbell also admitted that he "got that impression" from another detective, Ronald Canatella. However, Canatella testified he told attorney Morgan that Campbell was wanted by the police and he would personally handle his arrest if he gave himself up. He stated he also said this to the defendant when the latter phoned in March, 1977, but Campbell failed to surrender.
During his testimony the defendant was asked the following by the prosecutor:
Q. Did Mr. Canatella ever tell you that if you gave information on Mr. (Dale) Edwards that he would have the charges dropped against you?
A. No, Ms. Bane, he didn't say anything like that.
Q. Did you ever write to anyone and tell them that he had said that to you?
A. Not at all.
Despite this testimony, Campbell identified a letter that he wrote to a Mr. Pohiliberto in March of 1979 "about comming (sic) to N. O. to take care of the problem." It states in part the following:
I talked to Ronald Canatella, a detective, who said that all charges would be dropped if I would help him locate Dale Edwards."[3]
Other remarks in the same letter corroborated the state's assertion that defendant knew of the charges pending against him. For instance, with reference to the activities of the police in the beginning Campbell wrote:
"This was before any charge was made." and:
"What I think has happened, that the police want me to look guilty because they had a fake search warrant and had to falsely charge me to protect themselves and now because Connick told me to come in and see him, he is or may be angry at me."
On the second page of this letter Campbell added:
"If this (one of his plans) fails, then I would want all my friends to take the *959 matter to the D. A.; that is, all the art students, friends, would go to see Harry Connick, read my story, testimony to him, ask him to drop these false charges (conspiracy to commit a crime)."
Also, in the letter of March, 1979, the defendant instructed Mr. Philiberto to use the name "Larry Rogers" when referring to him. Obviously, this was a ruse to avoid identification and detection. Before the letter was produced Campbell testified that he had never used an alias except in one real estate transaction.
The defendant wrote another letter to a man named "Richard" on June 12, 1979, asking for advice and help in solving his "problem." He told the addressee that he was afraid to call, because he first wanted to tell him how to talk over the telephone. He requested Richard to address him as "Jerry Rogers" in future telephone conversations. In this letter, among other things, the defendant inquired about hiring another lawyer, talking to the district attorney again and an attempt by a friend to obtain amnesty for him from the governor. Of great significance to this case is the following:
"I want your opinion as to what to do? Give me your thoughts on the following:

Stall off for more time (Hoping the statues (sic) of limitations will help me."
In sustaining the motion to quash the trial judge found that the defendant possibly anticipated he might become involved in the "Boyscout imbroglio", but the state failed to establish he knew charges were pending against him and his absence from the state was caused by this rather than legitimate business purposes. We reverse.
The burden of proving that the defendant's purpose in remaining outside the state was to avoid detection, apprehension, or prosecution and thus interrupted the two year prescription as to prosecution rests, of course, on the state. In State v. Gendusa, 193 La. 59, 190 So. 332 (La.1939), such burden was said to require proof beyond a reasonable doubt. However, later cases indicate the burden is simply a "heavy" one in which the record must "clearly" establish that the purpose of the defendant's absence was to avoid detection, apprehension or prosecution. State v. Driever, 347 So.2d 1132 (La.1977); State v. Guidry, 395 So.2d 764 (La.1981); State v. Wicker, 391 So.2d 845 (La.1980). Be that as it may, we are convinced in this case that under either test the state has established that prescription was interrupted.
We are unable to agree with defense counsel's contention that because interruption of prescription involves a question of fact this court is prohibited by Article 5, § 5(C), of the Louisiana Constitution of 1974 from reviewing the trial court's decision thereon. In State v. Guilot, 200 La. 935, 9 So.2d 235 (La.1942), this court stated:
"Although the plea of prescription presented in a criminal case is a question of fact, it is not a question of fact relating to the guilt or innocence of the accused. The decision of the trial judge as to whether the offense charged is prescribed is reviewable by this court on the same facts upon which the decision was based."
However, it is quite clear that in reviewing a trial judge's ruling on a preliminary motion this court attaches great weight to his factual determinations and will not disturb them unless they are clearly erroneous. State v. Holley, 362 So.2d 1089 (La.1978).
Although the determination of this defendant's purpose in remaining out of the state involved conflicting testimony from him and his former attorney as opposed to the state's witnesses, Campbell's own letters clearly and unquestionably refute his assertion that he was unaware of any pending criminal charges against him while he was out of the state. On the contrary, he mentioned therein the "scout scandal"; that he had a "problem"; that certain events occurred before and after a "charge" was filed; that he was told by Detective Canatella that "all charges would be dropped" if he helped locate a missing witness; that he was in need of another lawyer; that he wanted his friends to ask the *960 district attorney "to drop these false charges (conspiracy to commit a crime)"; that his correspondents should use aliases in communicating with him about the matter; that he was interested in a friend's efforts to obtain amnesty from the governor; and that he needed an opinion as to whether he should "[s]tall off for more time (Hoping the statues (sic) of limitations" would help him. While it is obvious from the letters that the defendant had no intention of returning to New Orleans and facing the authorities while the charges were pending, there is no mention therein of any business in which he was engaged that caused him to remain out of the state.
It is clear to us from this, as well as other circumstances disclosed by the record, that the trial judge's finding was clearly wrong and that defendant Campbell did in fact leave and remain outside the state for the purpose of avoiding "detection, apprehension, or prosecution," either of which would cause the two year prescription applicable to prosecution to be interrupted under La.C. Cr.P. Art. 579(1).
Accordingly, the judgment of the trial court is set aside, the motion to quash the bill of information if overruled and the matter is remanded for further proceedings.
REVERSED AND REMANDED.
NOTES
[*] Judges E. L. Guidry, Jr. and G. William Swift, Jr. of the Court of Appeals, Third Circuit, and Judge Robert J. Klees of the Court of Appeal, Fourth Circuit, participated in this decision as Associate Justices ad hoc, joined by Associate Justices Pascal F. Calogero, Jr., James L. Dennis, Jack C. Watson and Harry T. Lemmon.
[1] The period of limitation established by Article 578 shall be interrupted if:

(1) The defendant at any time, with the purpose to avoid detection, apprehension, or prosecution, flees from the state, is outside the state, or is absent from his usual place of abode within the state;
[2] Neither of whom now represent the defendant.
[3] All emphasis in the quotations have been added by this court.